# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RICHARD BETKER,**

        **Plaintiff,**

      **v.**                                **Case No. 08-CV-00760**

**CITY OF MILWAUKEE, ALLEN
GROSZCZYK, EDWARD A. FLYNN and
RODOLFO GOMEZ,**

             **Defendants.**

---

## DECISION AND ORDER

Plaintiff, Richard Betker, brought this action under 42 U.S.C. § 1983 against several City of Milwaukee police officers, the police chief and the City claiming that defendants violated his constitutional rights in the course of obtaining and executing a "no-knock" search warrant. I dismissed all of plaintiff's claims except his claim against defendant Rodolfo Gomez. Plaintiff alleged that defendant Gomez violated his Fourth Amendment rights by making false or misleading representations in his application for the warrant. Plaintiff claimed that defendant's representations caused a court commissioner to issue the warrant which led to a search of his home and ultimately to his being shot. I denied defendant's assertion that he was entitled to qualified immunity, defendant appealed and the Seventh Circuit affirmed. Betker v. Gomez, 692 F.3d 854 (7th Cir. 2012).

In November 2013, I presided over a three-day jury trial of the lawsuit. The jury found in favor of plaintiff and awarded him $750,000 in compensatory damages and $250,000 in punitive damages. I entered judgment on the verdict and, pursuant to Fed. R. Civ. P. 59, defendant filed a motion for a new trial arguing that the jury instructions were

flawed, that several evidentiary rulings were in error and that the damages awarded were excessive. Plaintiff filed a response brief arguing that defendant's contentions are without merit. Defendant's motion is before me now.

## I. BACKGROUND

On August 4, 2006, defendant filled out a Milwaukee Police Department form affidavit and based on the affidavit sought a no-knock search warrant for plaintiff's home. In the affidavit, defendant stated:

> 4)      . . . that a convicted felon named Sharon Marie Betker (Capol), white female, 01-28-53 is reported to be in possession of at least 1 handgun, a dark colored semi-automatic handgun, at her residence at the location of 11053 S. 76th St., in the City of Franklin and County of Milwaukee, WI.  A known citizen witness, who wishes to remain anonymous, stated that within the last 5 days, the informant has observed BETKER in possession or control of at least one handgun, at the above-described address.  In addition, the informant stated that Betker and her husband RICHARD BETKER (w/m 3/12/1949) possess numerous hunting rifles and that they both engage in illegal hunting and the informant has seen stuffed animals like eagles, which are a protected species, in the residence. Affiant checked with the Wisconsin Department of Natural Resources and confirmed that Richard Betker at the above address obtained a Resident Gun Deer License in 2001 and a Small Game License in 2003, thus corroborating the information related to firearms at the residence.
>
> 5)      The affiant believes that the informant is a credible person because the informant has given law enforcement officers information, which has been directly corroborated by the knowledge and past experience of law enforcement officers. The informant is a citizen witness with prior criminal convictions but is not currently under indictment in Milwaukee County for any criminal charges.
>
> 6)      The affiant knows that guns and drugs are very commonly bought and sold together and that firearms are maintained in drug distribution houses to protect the occupants from robbery based on large quantities of cash traded in exchange for controlled substances. Affiant knows that firearms are not readily consumed and that they remain in close proximity to individuals engaged in ongoing criminal enterprises.
> . . .

2

9)     That it is common for more than one firearm to be located in a residence and that the information presented in this affidavit forms the basis to request a NO-KNOCK warrant. Specifically affiant states that the possession of firearms on person(s) involved in criminal activity, or having immediate access to them, possesses a severe and real threat to the safety of the officers executing the search warrant.

. . .

(Def.'s Aff. ¶¶ 4, 5, 6, 9.) Based on defendant's affidavit, the court commissioner issued a no-knock warrant.

The facts leading to defendant's submission of the affidavit are as follows: On July 27, 2006, Debra Capol called the Milwaukee Police Department's gun hotline and spoke with defendant. Capol made comments indicating that she did not get along with her sister Sharon Betker, plaintiff's wife, and asked defendant if a convicted felon could lawfully possess a firearm. Defendant told her that a convicted felon could not lawfully possess a firearm. Capol then reported that Sharon had a felony conviction, and that she and plaintiff had guns in their bedroom in their home in Franklin. Capol testified that she told defendant that she had not been in the Betker home for five years. Defendant made notes of his conversation with Capol but discarded them. Defendant checked Sharon's record and determined that she had been convicted of credit card fraud in 1982 but had no other convictions, and he determined that the Betkers owned a home in Franklin at the address Capol provided and that plaintiff had a Wisconsin hunting license. Defendant did not contact Sharon or plaintiff directly.

Defendant acknowledged that prior to filling out his affidavit he had not met Capol and that, to his knowledge, she had never served as a police informant. He also acknowledged that he knew of no ongoing criminal activity at the Betker home other than Sharon's possession of a gun. Defendant also stated that in preparing the warrant he

3

altered a template so that he could obtain a no-knock warrant instead of a standard warrant. Defendant did not disclose to the court commissioner who issued the warrant that Capol was Sharon's estranged sister or that Sharon's felony record consisted of a 24-year old credit card case.

The testimony at trial largely confirmed the Seventh Circuit's summary of what happened when the warrant was executed:

> At 10:00 p.m. on August 4, 2006, roughly fifteen officers from the Milwaukee Police Department's Tactical Enforcement Unit (TEU) executed a no-knock search warrant on the home of Richard and Sharon Betker on a tip from Sharon's estranged sister indicating that Sharon was a felon in possession of a firearm. Upon arrival, officers smashed the home's front window as a "distraction." They activated their red and blue police lights and beamed a powerful, blinding spotlight through the broken window and into the home. Sharon and Richard Betker, comfortably asleep in bed, were suddenly awakened by the violent crash of shattered glass and became disoriented by the loud, screaming voices and the bright, flashing lights. Unable to comprehend the commands being shouted by TEU officers, Richard instinctively thought that his home had been invaded. He grabbed one of his firearms, crouched behind a wall next to the couple's bedroom doorway, and shouted, "Who are you? What do you want? Who are you, who the f___ are you!" Receiving no response, and feeling that his and his wife's safety were at risk, Richard extended his arm into the doorway and brandished his weapon to show the apparent intruders that he was armed and ready to defend his domain.
>
> Seeing Richard's outstretched arm holding a weapon, TEU Officer Allen Groszczyk immediately fired. His first shot penetrated the door and bedroom wall, hitting Richard in his hand. Groszcyzk's other shots traveled the same path and struck Richard's shoulder. With Richard down, officers swarmed the room and detained both him and his wife. Although Officer Groszczyk claims to have yelled "search warrant—police!" before firing, Richard denies hearing or comprehending any verbal notifications or instructions.

Betker, 692 F.3d at 860.

4

## II. DISCUSSION

I may set aside a jury verdict only if it is against the manifest weight of the evidence or otherwise unfair to the moving party. Willis v. Lepine, 687 F.3d 826, 836 (7th Cir. 2012).

### A. Jury Instructions

In addressing a motion for a new trial based on an alleged deficiency in the instructions, I evaluate the instructions in their entirety. Huff v. Sheahan, 493 F.3d 893, 899 (7th Cir. 2007). My goal is to determine whether the instructions accurately and clearly informed the jury of the law. Id. I will grant the motion only if the instructions misstated the law or did not convey the relevant legal principles and one or both of these failings prejudiced the movant. Id. Jury instructions are not abstract treatises. Their purpose is to state the law applicable to the case at bar in order to assist the jury in reaching a verdict. U.S. v. Davis, 724 F.3d 949, 955 (7th Cir. 2013). Instructions should not leave out anything essential but, beyond that, should be as concise as possible. U.S. v. Hill, 252 F.3d 919, 923 (7th Cir. 2001). A district court has substantial discretion with respect to the precise wording of instructions so long as the final result completely and correctly states the law. U.S. v. Gibson, 530 F.3d 606, 609 (7th Cir. 2008).

At the close of the evidence, I proposed a set of instructions that accurately and clearly conveyed the relevant law to the jury. I based these instructions in substantial part on the Seventh Circuit's decision in the present case. On several issues, defendant proposed different instructions, some of which had been approved by the Seventh Circuit in other cases. I concluded that the instructions that I proposed conveyed the relevant law more clearly and succinctly than did defendant's proposals and that to varying degrees

5

defendant's proposed instructions contained unnecessary verbiage and dealt with issues not present in the case at bar. Thus, they were potentially confusing to the jury. In his motion for a new trial, defendant's main argument is that I should have given the instructions that he proposed. However, his arguments as to why the instructions given were deficient are unpersuasive.

Defendant first disputes the instruction given regarding when an officer acts in reckless disregard for the truth. The instruction provided:

> A police officer acts with a "reckless disregard for the truth" when making statements in an affidavit submitted to obtain a search warrant if he entertained serious doubts as to the truth of the statements contained in his affidavit, had obvious reason to doubt their accuracy, or failed to disclose facts that he knew would cause the judicial officer not to issue the warrant.

(Civil Jury Instructions at 13, ECF No. 100.) Defendant argues that this instruction somehow changed the focus from defendant's perspective to that of the judicial officer reviewing the affidavit. Defendant's argument fails for two reasons. First, defendant waived it by failing to object to it at the instruction conference. See Fed. R. Civ. P. 51(d)(1). Second, the argument is without merit. The instruction clearly defined when an officer acts with reckless disregard for the truth.

Defendant next objects to the instruction given on probable cause. Again, the instruction given clearly and accurately conveyed the applicable law to the jury. The instruction stated that the warrant had to be supported by probable cause and that probable cause "is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." (Jury Instructions at 13.) It is "sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a

6

crime." (Id. at 13–14.) Defendant's argument is that I should have given his proposed instruction:

> In determining whether information submitted to a judicial officer in support of a warrant application was sufficient to establish probable cause, we look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight. The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious. However, even if the complainant's story had inconsistencies, Officer Gomez was under no constitutional obligation to exclude every possibility that she was not telling the truth, unless the inconsistencies were such that a reasonable officer would become suspicious. It is not the function of the police officer to establish guilt. Rather the responsibility of sorting out conflicting testimony in assessing the credibility of putative victims and witnesses lies with the court.

(Def.'s Proposed Jury Instructions at 7, ECF No. 90.)

The problem with defendant's proposed instruction, however, was that some of its language dealt with matters not applicable in the present case, making the instruction potentially confusing. For example, the issue in the present case was not whether defendant could rely on a single witness but whether he included material in his affidavit that was unsupported by any witness. Similarly, the issue raised by Debra Capol's phone call to defendant was not the "inconsistencies" referred to in defendant's proposed instruction but whether, without defendant's embellishment, Capol described a situation that justified an application for a no-knock warrant.

Defendant next argues that I should have given Seventh Circuit Pattern Civil Jury Instruction 7.02 which, as adapted by defendant, read as follows:

> Plaintiff must prove by a preponderance of the evidence that Officer Rodolfo Gomez was personally involved in the conduct that Plaintiffs complain about. You may not hold Rodolfo Gomez liable for what other employees did or did not do.

7

(Def.'s Proposed Jury Instructions at 3.) This argument is also unpersuasive. Taken overall, the instructions given made it clear that to find defendant liable the jury had to find that he was personally involved. Moreover, the conduct complained of was making false or misleading statements, and it was undisputed that defendant made the statements in question. As I indicated at the instruction conference:

> There's no issue in this case that—I mean, there's no issue that Detective Gomez was the person who wrote out this affidavit and that this affidavit is what the claim is about.

(Transcript ("Tr.") at 519.) Besides being redundant, defendant's proposed instruction was misleading because it implied that defendant had to be exonerated because "other employees" of the police department fired the shots that struck plaintiff.

In sum, the instructions given were accurate and complete, and, even assuming that they were imperfect, defendant has failed to show that they prejudiced him in any respect.

## B. Evidentiary Issues

A district court should set aside a jury verdict based on the admission or exclusion of evidence only if the court committed an error and the error affected a party's substantial rights. Barber v. City of Chicago, 725 F.3d 702, 715 (7th Cir. 2013). An error affects a party's substantial rights if "there is a significant chance that the error affected the jury's verdict." Id.

### 1. Forseeability of plaintiff's damages

Defendant argues that plaintiff's damages from the execution of the search warrant were not foreseeable to him and that evidence of such damages should have been excluded. The special verdict form asked the jury two questions relevant to this issue.

8

Question 2 asked whether defendant's statements set into motion a chain of events that caused injury to plaintiff. And Question 3 asked whether plaintiff's injuries were reasonably foreseeable to defendant when he made the statements. The jury answered "yes" to both questions. The evidence supported both findings, and defendant's argument to the contrary is unpersuasive.

Defendant argues that because he could not predict with certainty the chain of events that led to plaintiff's damages, the damages should be regarded as unforeseeable. However, if a plaintiff establishes that the defendant breached a duty, as plaintiff did here, the question of whether the damages that resulted were foreseeable is for the jury. See, e.g., Taylor v. District of Columbia, 951 F. Supp. 2d 186, 198 (D.D.C. 2013); Delgado v. Pawtucket Police Dept., 747 F. Supp. 2d 341, 354 (D.R.I. 2010); Noga v. City of Schenectady Police Officers, 169 F. Supp. 2d 83, 89 (N.D.N.Y. 2001). And for damages to be foreseeable, it is not required that the exact consequence resulting from an act be foreseen. Peek v. Ford Motor, Co., 603 F. 2d 1240, 1246 (7th Cir. 1979). Moreover, defendant was keenly aware of the danger posed by the presence of guns in plaintiff's household. Such danger is precisely why he sought a no-knock warrant. (Tr. at 441.) Defendant also knew that a no-knock warrant would be executed by a heavily armed SWAT team. In fact, prior to the execution of the warrant, defendant briefed the SWAT team and informed it that plaintiff possessed high-powered rifles. Thus, defendant has little reason to argue that he could not have foreseen that the statements in his affidavit would lead to weapons being fired.

9

## 2.    Grant of plaintiff's motion in limine as to Chisholm

Defendant next argues that I should have permitted Milwaukee County District Attorney, John Chisholm, to testify even though defendant did not timely disclose him as a witness. The facts relating to this issue are as follows: On January 8, 2009, I adopted the parties' proposed discovery schedule and ordered them to disclose their expert and lay witnesses by June 8, 2009. At the parties' request, I later modified the schedule, extending the deadline for the disclosure of witnesses first to November 1, 2009 and then to August 1, 2010. Defendant did not disclose Chisholm as either an expert or lay witness on or before August 1, 2010, and he never asked to amend his discovery disclosures to add Chisholm as a witness. On June 24, 2013, I issued a trial scheduling order that required the parties to submit pretrial reports including witness lists by October 16, 2013. On that day, defendant filed a witness list which did not include Chisholm. On October 17, defendant submitted a letter asking that Chisholm be added to the witness list. The letter mentioned "computer problems" but did not indicate that such problems had prevented defendant from listing Chisholm as a witness in his discovery disclosures or on his pretrial witness list. Plaintiff filed a motion in limine asking that Chisholm be excluded from testifying.

I allowed plaintiff to depose Chisholm but put off ruling on the motion in limine until defendant had filed a response. However, defendant never filed any response to plaintiff's motion, submitting neither an affidavit nor a brief. Thus, at the end of the first day of trial, I granted plaintiff's motion in limine. I based my ruling on the fact that defendant had not timely disclosed Chisholm as a witness in his pretrial report and had not justified his failure to do so.  See Civil Local Rule 16(c)(1) (requiring disclosure of witnesses in pretrial reports

10

"absent a showing of good cause"). I also based it on defendant's failure to comply with the discovery order which required him to disclose Chisholm as a witness long before October 16, 2013. See Alioto v. Town of Lisbon, 651 F.3d 715, 719–20 (7th Cir. 2011) (requiring "good cause" to extend a deadline in a discovery scheduling order and noting that "the primary consideration for district courts is the diligence of the party seeking [the extension]"); see also Fed. R. Civ. P. 37(b)(2) (allowing a district court to issue sanctions for failure to comply with a discovery order). Finally, I noted that Chisholm's deposition made clear that he had no knowledge of the circumstances giving rise to the warrant independent of what defendant had told him. (Dep. of John Chisholm, Pl's. Ex. 40 at 39.)

Defendant objected to my ruling and argued that Chisholm's name had been omitted from the pretrial report because his counsel's secretary had trouble opening the latest draft of defendant's witness list on the day pretrial reports were due and so he had filed an earlier version that did not include Chisholm. However, defendant did not provide a sufficient explanation for why Chisholm had not been included in the discovery disclosures or why he had not filed a response to plaintiff's motion in limine.[1] He stated that he had not included Chisholm's name in his discovery disclosures because it was not apparent that Chisholm's testimony was relevant until I issued my order denying his motion for summary judgment. But I denied the motion for summary judgment in August 2011 and the Seventh Circuit affirmed in September 2012—over a year before trial. Defendant had

---

[1] In his brief in support of his motion for a new trial, defendant says that he filed an affidavit to support his counsel's verbal response to the motion in limine. But the affidavit he refers to was filed on November 26, 2013—six days after the jury rendered its verdict. (See Aff. of Susan E. Lappen, ECF No. 106.)

11

plenty of time to amend his discovery disclosures to include Chisholm as a witness but made no attempt to do so.

Thus, I do not believe I erred in granting plaintiff's motion in limine. Even if I did err, however, I cannot say that the error affected defendant's substantial rights. Chisholm's deposition made clear that, other than notarizing defendant's signature on the affidavit seven years previous when he was an assistant district attorney and asking defendant to find out whether the Betkers had applied for a hunting license, he had no recollection of the case. (Chisholm Dep. at 28.) Chisholm stated that everything he knew about the circumstances giving rise to the warrant came to him via defendant. (Id. at 39.)

Defendant suggests that Chisholm's testimony was necessary because he would have testified that the District Attorney's file for this case contains a copy of the court-stamped search warrant application, which would have proven that Paragraph 6 was crossed out prior to the affidavit being presented to the court commissioner. However, defendant testified without contradiction that an assistant district attorney had crossed out Paragraph 6 before he submitted the affidavit to the court commissioner. (Tr. at 54–55, 436–38, 497–98, 502) And both parties introduced copies of the affidavit showing Paragraph 6 crossed out. (Pl.'s Ex. 2, 42; Def.'s Ex. 501.)

### 3. Capol Testimony

Defendant next argues that I improperly handled the matter of Debra Capol's testimony. The facts relating to this issue are as follows: Both parties listed Capol as a witness in their pretrial reports. However, Capol refused to cooperate with plaintiff and evaded his efforts to serve her with a subpoena. Plaintiff, therefore, argued that Capol was "unavailable" to him as a witness under Fed. R. Evid. 804(a) enabling him to read into the

12

record testimony from her deposition under Fed. R. Evid. 804(b)(1) and Fed. R. Civ. P. 32. To establish unavailability, plaintiff called his process server, Les Johns, who testified that he had attempted to serve Capol on nine different occasions on four or five different dates, including knocking on her door when the television and lights were on and cars parked in back, leaving business cards at her home which were later picked up, and unsuccessfully attempting to telephone her. Johns concluded, based on having served thousands of people, that Capol was intentionally evading plaintiff's efforts to serve her. Based on Johns's testimony, I determined that plaintiff had made reasonable efforts to serve Capol and that her evasion of service had made her unavailable. However, at the same time that Capol was evading plaintiff, she was cooperating with defendant. She had made herself available to defendant's counsel by telephone, accepted service of defendant's subpoena, and agreed to appear in court when defendant's counsel called her.

On the second day of trial, Tuesday, at the end of the morning's testimony, plaintiff's counsel asked to read into the record three questions and answers from Capol's deposition. I indicated that I much preferred live testimony, and both counsel agreed. However, Capol was not present. Defendant's counsel said that if plaintiff was to be permitted to read in portions of Capol's deposition defendant wished to read in other portions. Plaintiff's counsel indicated that this was acceptable subject to his being able to object to the admissibility of the material defendant wished to present. Plaintiff's counsel also indicated that after portions of Capol's deposition were read in, he intended to call one final witness, Zachary Hamburg, whose testimony related to Capol's, and rest his case. During the lunch hour, plaintiff's and defendant's counsel went over the portions of Capol's deposition that defendant's counsel wished to offer.

13

At about 1:20 p.m., we reconvened, and it became clear that defendant wished to admit many pages of Capol's deposition—far more than the few lines that plaintiff wished to offer—and that plaintiff objected to much of defendant's submission on a variety of evidentiary grounds including relevance, hearsay and the applicability of Fed. R. Evid. 403. We began to go through the testimony that defendant wished to admit and the objections to it. I upheld many of plaintiff's objections but soon realized that to address thoughtfully all of the objections to the many pages of Capol's deposition that defendant wished to admit would take most or all of the afternoon. This would have necessitated sending home both the jury—which would have heard no testimony that afternoon—and the witness, Hamburg, who had left his job to come testify. In short, from the standpoint of managing the trial reasonably efficiently, the situation was undesirable.

Ultimately, I decided that there had to be a better way to handle the situation. I reiterated that it would be preferable to have Capol testify in person and suggested to defendant's counsel that she call Capol and ask her to come to court immediately. Defendant's counsel called Capol and after speaking to her stated that Capol would come to court at 9:00 a.m. the next morning but was unwilling to appear before then. However, that left us unable to proceed. I, therefore, decided that the fairest and most practical approach would be to allow plaintiff to read in the several lines of Capol's deposition that he wished to admit, call Hamburg as a witness and then rest. Defendant could then proceed with his case, and the next morning defendant's counsel could question Capol about the parts of her deposition that were read in or anything else. This would avoid having to send the jury and Hamburg home and wasting a half day of available trial time. Thus, on Tuesday afternoon, plaintiff read in three questions and answers from Capol's

14

deposition, questioned Hamburg and rested, and defendant began the presentation of his case.

On Wednesday morning, however, defendant's counsel stated that on Tuesday night she had called Capol and told her not to come to court. Defendant's counsel had apparently decided that she did not wish to question Capol after all. Defendant then proceeded with the presentation of his case. At the close of the case, defendant asked that I admit into evidence all portions of Capol's deposition that he had sought to read in. I denied defendant's request.

Defendant now makes several arguments with respect to Capol. First, he argues that I mismanaged the matter. However, Fed. R. Evid. 611(a) directs district courts to exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to "make those procedures effective for determining the truth [and] avoid wasting time." See Chlopek v. Fed. Ins. Co., 499 F.3d 692, 702–03 (7th Cir. 2007) (stating that "[t]he rules of evidence give a district judge wide latitude to control proceedings"). As stated, I believe that I managed the matter fairly and expeditiously by insuring that defendant would have the opportunity to question Capol about the statements in her deposition and at the same time allowing the case to proceed without sending the jury and a citizen witness home and unnecessarily lengthening the duration of the trial.

Second, defendant argues that I should not have found Capol unavailable. However, plaintiff wanted to call her as a witness and, as discussed, the evidence unequivocally indicated that Capol was intentionally evading his efforts to serve her. Thus, Capol was clearly unavailable. See Fed. R. Evid. 804(a)(5). Further, if defendant wanted Capol to testify in person, instead of via her deposition, she could have easily made that possible

inasmuch as she was in regular telephone contact with Capol and had served her with a subpoena. Defendant's counsel made it clear, however, that she had no interest in having Capol testify in person.

Finally, defendant argues that I should have granted his motion at the close of evidence to admit all of the material from Capol's deposition that defendant wished to admit. Without admission of this material, defendant argues that he did not have the opportunity to cross-examine Capol as required by Fed. R. Evid. 804(b)(1). This argument is also unpersuasive. First, as discussed, much of the material that defendant wished to admit was inadmissible on grounds of relevance, hearsay and Fed. R. Evid. 403. Second, Fed. R. Civ. P. 32(a)(6), provides that when a party offers part of a deposition in evidence, a court must admit only those other parts offered by the opposing party that "in fairness should be considered with the part introduced." But defendant does not mention Rule 32(a)(6) and provides no reason to conclude that the materials he offered should have been considered with the questions plaintiff introduced. Further, after defendant's counsel directed Capol not to come to court, it is hard to understand how fairness required the admission of additional Capol deposition material. Even assuming, however, that the additional material from Capol's deposition should have been admitted, I conclude that nothing in that material was of such significance that it affected defendant's substantial rights.

### 4.    Dr. Hodgson's Testimony

In defendant's principal brief, he contended that I erred in not ruling on the objections he made while attending Dr. Hodgson's video deposition. However, he did not mention this matter in his reply brief. Assuming that he has not dropped the issue, the

argument is without merit. Hodgson's videotape was played in court without objection by defendant. The transcript of the deposition was used as the official court record, and the parties stipulated to its admission into evidence. Defendant did not call my attention to the objections made at the deposition or ask me to rule on them. Thus, pursuant to Fed. R. Evid. 103(a), defendant waived these objections. Even, however, if defendant did not waive them, he has made no effort to establish that he was prejudiced by any of Hodgson's videotaped testimony.

### 5.    Testimony of Plaintiff's Expert, Quinn

Finally, defendant argues that plaintiff's expert, Michael Quinn, was not qualified to testify as an expert. The parties briefed this issue before trial and, based on Quinn's background and experience, I determined that under <u>Daubert v. Merrill Dow. Pharm. Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999), Quinn was well qualified to provide expert testimony. Quinn testified that he was a Minneapolis police officer for more than 23 years, 17 years of which were spent on the SWAT team. (Tr. at 209.) He ran the Minneapolis Police Academy for four years. (<u>Id.</u>) He designed police curriculum for the State of Minnesota and has authored a book on police ethics. (Tr. at 210.) He also testified he had experience writing affidavits and search warrants and had supervised and educated others in drafting affidavits and search warrants (Tr. at 217–18.) Quinn's qualifications were more than sufficient, and his testimony was reliable and relevant.

Defendant argues that because Quinn was from Minnesota he should not have been permitted to testify about matters in Milwaukee County. However, defendant cites no authority for this assertion and ignores the fact that search and seizure law is federal,

17

stemming from the Fourth Amendment. Defendant also argues that Quinn should not have been permitted to state his conclusion first and then back it up with his reasoning. However, defendant also cites no authority for this argument and does not explain why the manner in which Quinn testified was a problem.

### C.    Damages

Finally, defendant argues that the jury's award of damages was excessive and that I should, therefore, order a new trial or reduce the damages. Defendant challenges the jury's award of both compensatory and punitive damages, but he does not develop his argument with regard to compensatory damages in his brief in support of his motion. He states only that "the damages awarded were excessive." (Def.'s Br. in Support of Rule 59 Mot. at 22.) Thus, I find that he has waived this argument. See Puffer v. Allstate Ins. Co., 675 F.3d 709, 718 (7th Cir. 2012) (even arguments that are raised are waived "if they are underdeveloped, conclusory, or unsupported by law"). Even if it were not waived, I would reject this argument on the merits.

To determine whether an award of compensatory damages is excessive, I consider whether the damages awarded (1) were monstrously excessive, (2) had no rational connection between the award and the evidence, and (3) were roughly comparable to awards made in similar cases. G.G. v. Grindle, 665 F.3d 795, 798–99 (7th Cir. 2011). Here, the jury awarded plaintiff $750,000 in compensatory damages. Although the verdict was substantial, based on the evidence presented, it was not excessive, and there is no suggestion by defendant that the award was higher than awards made in similar cases. Plaintiff incurred $22,251.24 in past medical expenses, $1,000 for a prosthesis, $14,000 in repair bills, $7,410 for broken carnival glass, $4,000 for a cabinet and $3,000 for a rifle

18

scope. Plaintiff also presented evidence indicating serious permanent damage to his right hand. His middle finger was hollowed out by a bullet causing a lasting disability. Plaintiff has a hole in his hand, which prevents him from doing many normal things as, for example, removing change from his pocket. Plaintiff's treating physician, Dr. Hodgson, opined that plaintiff was a good candidate for a ray resection procedure in which the stump of his finger would be amputated creating a more functional three finger hand at a cost of $10,000 to $20,000. However, plaintiff's hand will be permanently disfigured.

Plaintiff was also shot in the left shoulder which, prior to the shooting, was his good shoulder. Plaintiff's right shoulder had been previously damaged in an accident. Plaintiff testified as to his lingering pain in his shoulder, the fact that he had received cortisone shots for years which were no longer effective and that he was to have surgery soon after the trial. Dr. Hodgson testified that there were procedures that might help including a shoulder arthroscopy, which costs between $15,000 and $25,000, and an arthroplasty, which costs between $30,000 and $50,000. Plaintiff also incurred a great deal of physical and emotional pain and suffering as the result of the invasion of his home and the shooting. When the incident occurred, he feared for his life and that of his wife. He was forced to lie bleeding, naked, in broken glass and was slammed against a wall and windowsill. Plaintiff also testified that the effects of that traumatic evening remain with him. Finally, plaintiff was jailed for three days.

Between past and future medical expenses, property damage and physical and mental pain and suffering, plaintiff presented sufficient evidence to support the jury's compensatory damages award. See Grindle, 665 F.3d at 799 (great deference should be

Case 2:08-cv-00760-LA   Filed 05/19/14   Page 19 of 21   Document 134

given to the jury's verdict because the jury "is in a superior position to determine a proper damages award").

The evidence also justified the jury's award of punitive damages. Defendant argues that there is no basis for the jury's award of $250,000 in punitive damages in this case. The instruction on punitive damages, to which defendant did not object, advised the jury that it could award plaintiff punitive damages only if defendant's conduct "was malicious or in reckless disregard of plaintiff's rights. Conduct is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring Plaintiff. Conduct is in reckless disregard of Plaintiff's rights if, under the circumstances, it reflects indifference to Plaintiff's safety or rights." (Jury Instructions at 17.) Defendant argues that there is no basis for punitive damages because there was no evidence presented that showed defendant ever had contact with plaintiff before the search or that he acted out of ill will or malice. Although there was no evidence of ill will or malice, the jury obviously concluded that defendant acted in reckless disregard of plaintiff's rights, and that a substantial punitive damages award was needed to punish and deter defendant. Under the circumstances, this conclusion was reasonable. There was a basis in the evidence for the jury to conclude that defendant made serious misrepresentations in his affidavit for a no-knock warrant. See Smith v. Wilson, 705 F.3d 674, 677–78 (7th Cir. 2013) ("[A] verdict may be set aside only if 'no rational jury could have rendered' it . . . .").

## III. CONCLUSION

For the reasons stated, I conclude that defendant's arguments in support of setting aside the jury verdict and ordering a new trial lack merit.

20

**THEREFORE, IT IS ORDERED** that defendant's motion for a new trial or in the alternative to alter or amend the judgment (Docket #117) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to strike defendant's reply brief (Docket #132) is **DENIED**.

Dated at Milwaukee, Wisconsin this 19th day of May 2014.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge

Case 2:08-cv-00760-LA   Filed 05/19/14   Page 21 of 21   Document 134